**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FEENSTRA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> QUALCOMM INCORPORATED, STEVEN M. MOLLENKOPF, GEORGE S. DAVIS, PAUL E. JACOBS, and WILLIAM E. KEITEL, <br><br> Defendants | Case No. **'17CV155 LAB JLB** <br><br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

Plaintiff James Feenstra ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QUALCOMM Incorporated ("Qualcomm" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Qualcomm between November 7, 2012 and January 19, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Qualcomm is a global semiconductor company that develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"). QCT deals with equipment sales while QTL engages in licensing of patents and technology. QCT, a wholly-owned

2

subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm. QTL, a third wholly-owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

3.     Founded in January 1985, the Company is headquartered in San Diego, California.  The Company's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "QCOM."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Qualcomm engaged in anticompetitive conduct to maintain a monopoly for semiconductors used in mobile phones in violation of federal law; (ii) in turn, Qualcomm lacked effective internal controls over financial reporting; and (iii) as a result, Qualcomm's public statements were materially false and misleading at all relevant times.

5.     On December 28, 2016, the South Korean Fair Trade Commission fined Qualcomm a record $853 million for violating antitrust laws. After a three-year investigation, the Korean antitrust regulator found that Qualcomm breached antitrust law by limiting competing chip makers' access to its patents. It also found that the Company

forced mobile-phone manufacturers into unfair license agreements by refusing to supply critical phone chips to those that would not accept Qualcomm's terms.

6.    On this news, Qualcomm's share price fell $1.50, or 2.23%, to close at $65.75 on December 28, 2017.

7.    On January 17, 2017, the U.S. Federal Trade Commission ("FTC") commenced an enforcement action against Qualcomm following an investigation of the Company's licensing practices.  The agency's complaint, filed in U.S. District Court for the Northern District of California, said that Qualcomm used its dominant position to maintain an illegal monopoly in the market for mobile phone chips.

8.    On this news, Qualcomm's share price fell $2.69, or 4.02%, to close at $64.19 on January 17, 2017.

9.    On January 20, 2017, The *Wall Street Journal* reported that tech-giant Apple Inc. was suing Qualcomm, alleging that the Company "leveraged its monopoly position as a manufacturer of baseband chips, a critical component used in cellphones, to seek 'onerous, unreasonable and costly' terms for patents, and that Qualcomm blocked Apple's ability to choose another supplier for chipsets."  The article further reported that Apple was seeking $1 billion in rebate payments that Qualcomm allegedly withheld as retribution for Apple's involvement in an investigation conducted by South Korea's antitrust regulator.

4

10.    On this news, Qualcomm's share price fell $1.56, or 2.42%, to close at $62.88 on January 20, 2017.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Qualcomm's principal executive offices are located within this Judicial District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

16.    Plaintiff, as set forth in the accompanying Certification, purchased common shares of Qualcomm at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

17.    Defendant Qualcomm is incorporated in Delaware, and the Company's principal executive offices are located at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm's common stock trades on the NASDAQ under the ticker symbol "QCOM."

18.    Defendant Steven M. Mollenkopf ("Mollenkopf") has served as the Company's Chief Executive Officer ("CEO") and Director since March 2014.

19.    Defendant George S. Davis ("Davis") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since March 2013.

20.    Defendant Paul E. Jacobs ("Jacobs") served as the Company's CEO from July 2005 to March 2014 and has served as Chairman of the Company's Board of Directors since March 2009.

21.    Defendant William E. Keitel ("Keitel") served as the Company's CFO from February 2002 to March 2013 and as Executive Vice President from December 2003 to March 11, 2013.

22.    The Defendants referenced above in ¶¶ 18-21 are sometimes referred to herein as the "Individual Defendants."

6

## SUBSTANTIVE ALLEGATIONS
### Background

23.    Qualcomm is a global semiconductor company that develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments: Qualcomm CDMA Technologies and Qualcomm Technology Licensing. QCT deals with equipment sales while QTL engages in licensing of patents and technology. QCT, a wholly-owned subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc., another wholly-owned subsidiary of Qualcomm. QTL, a third wholly-owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

24.    Founded in January 1985, the Company is headquartered in San Diego, California.

### Materially False and Misleading
### Statements Issued During the Class Period

25.    The Class Period begins on November 7, 2012, when Qualcomm filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended September 30, 2012 (the "2012 10-K").  For the quarter, Qualcomm reported net income of $1.27 billion, or $0.73 per diluted share, on revenue of $4.87 billion, compared to net income of $1.05 billion, or $0.62 per diluted share, on revenue of $4.12 billion for the same period in the prior year. For 2012, Qualcomm reported net income of $6.1 billion, or $3.51 per diluted share, on

7

revenue of $19.1 billion, compared to net income of $4.26 billion, or $2.52 per diluted share, on revenue of $14.95 billion for 2011.

26.    In the 2012 10-K, Qualcomm stated, in part:

> ***Our Revenues***. We generate revenues by selling products and services, which include:
> - integrated circuits (also known as chips or chipsets) and Radio Frequency (RF) and Power Management (PM) chips and system software used in mobile devices and in wireless networks;
> - integrated circuits for use in wired devices, particularly broadband gateway equipment, desktop computers, televisions and Blu-ray players;
> - equipment, software and services used by companies, including those in the transportation industry and governments, to wirelessly manage their assets and workforce;
> - software products and services for content enablement across a wide variety of platforms and devices for the wireless industry;
> - software products and services that enable mobile commerce services; and
> - software and hardware development services.
>
> We also generate revenues by licensing portions of our intellectual property portfolio, which includes certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products.

27.    The 2012 10-K discussed Qualcomm's "significant position" in the wireless communication industry, stating in pertinent part:

> **Competition**
> Competition in the communications industry throughout the world continues to increase at a rapid pace as consumers, businesses and governments realize the potential of wireless communications products and services. We have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers. Although we have attained a significant position in

8

the industry, many of our current and potential competitors may have advantages over us, which include, among others, motivation by our customers in certain circumstances to find alternate suppliers or choose alternate technologies and foreign government support of other technologies (e.g., GSM) or our competitors. In addition, our competitors may have established more extensive relationships with local distribution and original equipment manufacturer companies in emerging geographic regions (e.g., China) or a more established presence in certain device markets. These relationships may affect customers' decisions to purchase products or license technology from us. Accordingly, new competitors or alliances among competitors could emerge and rapidly acquire significant market positions to our detriment.

We expect to continue to face competition throughout the world as new technologies and services are introduced in the future and as additional companies compete with our products or services based on 3G, 4G or other technologies. Although we intend to continue to make substantial investments in developing improvements to existing and new products and technologies, our competitors may introduce alternative products, services or technologies that threaten our business. It is also possible that the price we charge for our products and services may continue to decline as competition continues to intensify.

28.     The  2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Jacobs and Keitel, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On January 30, 2013, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 30, 2012 (the "Q1 2013 10-Q").   For the quarter, Qualcomm reported net income of $1.9 billion, or $1.09 per diluted share, on revenue of $6.01 billion, compared

9

to net income of $1.4 billion, or $0.81 per diluted share, on revenue of $4.68 billion for the same period in the prior year.

30.    The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Jacobs and Keitel, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.    On April 24, 2013, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q2 2013 10-Q"). For the quarter, Qualcomm reported net income of $1.86 billion, or $1.06 per diluted share, on revenue of $6.12 billion, compared to net income of $2.23 billion, or $1.28 per diluted share, on revenue of $4.93 billion for the same period in the prior year.

32.    The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Jacobs and Davis, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.    On July 24, 2013, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q3 2013 10-Q"). For the quarter, Qualcomm reported net income of $1.58 billion, or $0.90 per diluted share, on revenue of $6.24 billion, compared to net

income of $1.2 billion, or $0.69 per diluted share, on revenue of $4.62 billion for the same period in the prior year.

34.   The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Jacobs and Davis, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.   On November 6, 2013, Qualcomm filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended September 29, 2013 (the "2013 10-K").   For the quarter, Qualcomm reported net income of $1.50 billion, or $0.86 per diluted share, on revenue of $6.48 billion, compared to net income of $1.27 billion, or $0.73 per diluted share, on revenue of $4.87 billion for the same period in the prior year.   For 2013, Qualcomm reported net income of $6.85 billion, or $3.91 per diluted share, on revenue of $24.86 billion, compared to net income of $6.1 billion, or $3.51 per diluted share, on revenue $19.12 billion for 2012.

36.   The 2013 10-K contained signed certifications pursuant to SOX by Defendants Jacobs and Davis, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

**The Truth Begins to Emerge**

11

37.    On November 25, 2013, Qualcomm issued a press release titled "China's National Development and Reform Commission ["NDRC"] Notifies Qualcomm of Investigation" revealing that the NDRC had commenced an investigation concerning the Company's potential violations of China's Anti-Monopoly Law.

38.    On January 29, 2014, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 29, 2013 (the "Q1 2014 10-Q").  For the quarter, Qualcomm reported net income of $1.87 billion, or $1.09 per diluted share, on revenue of $6.62 billion, compared to net income of $1.9 billion, or $1.09 per diluted share, on revenue of $6.01 billion for the same period in the prior year.

39.    The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.    On April 23, 2014, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 30, 2014 (the "Q2 2014 10-Q").  For the quarter, Qualcomm reported net income of $1.95 billion, or $1.14 per diluted share, on revenue of $6.36 billion, compared to net income of $1.86 billion, or $1.06 per diluted share, on revenue of $6.12 billion for the same period in the prior year.

41.    The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.    On July 23, 2014, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 29, 2014 (the "Q3 2014 10-Q").  For the quarter, Qualcomm reported net income of $2.23 billion, or $1.31 per diluted share, on revenue of $6.8 billion, compared to net income of $1.58 billion, or $0.90 per diluted share, on revenue of $6.24 billion for the same period in the prior year.

43.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.    On November 5, 2014, Qualcomm filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended September 28, 2014 (the "2014 10-K").  For the quarter, Qualcomm reported net income of $1.89 billion, or $1.11 per diluted share, on revenue of $6.69 billion, compared to net income of $1.5 billion, or $0.86 per diluted share, on revenue of $6.48 billion for the same period in the prior year.  For 2014, Qualcomm

13

reported net income of $7.96 billion, or $4.65 per diluted share, on revenue of $26.48 billion, compared to net income of $6.85 billion, or $3.9 per diluted share, on revenue $24.86 billion for 2013.

45.    In the 2014 10-K, Qualcomm disclosed new antitrust probes involving the Company, stating in pertinent part:

> *European Commission Investigation*: On October 15, 2014, the Commission notified us that it is conducting an investigation of us relating to Article 101 and/or 102 of the Treaty on the Functioning of the European Union (TFEU) and Article 53 and/or 54 of the Agreement for the European Economic Area (EEA Agreement). **We understand that the investigation concerns primarily the sale and/or marketing of our baseband chipsets, including alleged conditions relating to the provision by us of rebates and/or other financial incentives.** If a violation is found, a broad range of remedies is potentially available to the Commission, including imposing a fine and/or injunctive relief prohibiting or restricting certain business practices. Given that this investigation is in its early stages, it is difficult to predict the outcome or what remedies, if any, may be imposed by the Commission. We continue to cooperate with the Commission as it conducts its investigation.
>
> …
>
> *China National Development and Reform Commission (NDRC) Investigation:* In November 2013, the NDRC notified us that it had commenced an investigation of us relating to the Chinese Anti-Monopoly Law (AML). We understand that the investigation concerns primarily our licensing business and certain interactions between our licensing business and our chipset business, including how royalties are calculated in our patent licenses, the value exchanged for cross-licenses to patents of our licensees, **whether we will offer license agreements limited to patents essential to certain standards, whether royalties are sought for our expired patents, our policy of selling chipsets only to our patent licensees, the alleged refusal of us to grant patent licenses to chipset manufacturers,** and certain other terms and conditions in our patent license and chipset sale agreements. A broad range of remedies with

14

respect to business practices deemed to violate the AML is potentially available to the NDRC, including but not limited to issuing an order to cease conduct deemed illegal, confiscating gains deemed illegally obtained, imposing a fine in the range of 1% to 10% of the prior year's revenues and requiring modifications to business practices. Given the limited precedent of enforcement actions and penalties under the AML, it is difficult to predict the outcome of this matter or what remedies may be imposed by the NDRC. We continue to cooperate with the NDRC as it conducts its investigation.

…

*Federal Trade Commission (FTC) Investigation*: On September 17, 2014, the FTC notified us that it is conducting an investigation of us relating to Section 5 of the Federal Trade Commission Act. **We understand that the investigation concerns primarily our licensing business, including potential breach of FRAND commitments.** If a violation of Section 5 is found, a broad range of remedies is potentially available to the FTC, including imposing a fine or requiring modifications to our licensing practices. Given that this investigation is in its early stages, it is difficult to predict the outcome of this matter or what remedies, if any, may be imposed by the FTC. We continue to cooperate with the FTC as it conducts its investigation.

(Emphasis added.)

46.    On this news, Qualcomm shares fell $6.62, or 8.57%, to close at $70.58 on November 6, 2014.

47.    The 2014 10-K contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

48.    On January 28, 2015, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended

December 28, 2014 (the "Q1 2015 10-Q").  For the quarter, Qualcomm reported net income of $1.97 billion, or $1.17 per diluted share, on revenue of $7.09 billion, compared to net income of $1.87 billion, or $1.09 per diluted share, on revenue of $6.62 billion for the same period in the prior year.

49.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50.     On February 9, 2015, Qualcomm disclosed that the Company agreed to pay a $975 million fine as part of a settlement with China's National Development and Reform Commission and agreed to include several changes to the Company's practices in licensing patents for mobile phones sold in China.  Chinese antitrust authorities started investigating the Company in November 2013 and found that Qualcomm violated the country's antimonopoly laws.

51.     On April 22, 2015, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 29, 2015 (the "Q2 2015 10-Q").  For the quarter, Qualcomm reported net income of $1.05 billion, or $0.63 per diluted share, on revenue of $6.89 billion, compared to net income of $1.95 billion, or $1.14 per diluted share, on revenue of $6.36 billion for the same period in the prior year.

52.    In the Q2 2015 10-Q, Qualcomm stated, in part:

On February 9, 2015, we announced that we had reached a resolution with the China National Development and Reform Commission (NDRC) regarding its investigation of us relating to China's Anti-Monopoly Law (AML). **The NDRC issued an Administrative Sanction Decision finding that we had violated the AML, and we agreed to implement a rectification plan that modifies certain of our business practices in China.** In addition, **the NDRC imposed a fine on us of 6.088 billion Chinese Yuan Renminbi (approximately $975 million),** which was recorded in other expenses and was paid, primarily with cash held by foreign entities, in the second quarter of fiscal 2015.

(Emphases added.)

53.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

54.    On July 16, 2015, the European Commission ("EU") issued a press release announcing the commencement of two antitrust investigations into "into abusive behavior by Qualcomm" and whether the Company breached EU antitrust rules by engaging in "predatory pricing" to force competitors out of the market.

55.    On July 22, 2015, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 28, 2015 (the "Q3 2015 10-Q").  For the quarter, Qualcomm reported net income of $1.18 billion, or $0.73 per diluted share, on revenue of $5.83 billion, compared to net

income of $2.23 billion, or $1.31 per diluted share, on revenue of $6.8 billion for the same period in the prior year.

56.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.    On November 4, 2015, Qualcomm filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended September 27, 2015 (the "2015 10-K"). For the quarter, Qualcomm reported net income of $1.06 billion, or $0.67 per diluted share, on revenue of $5.45 billion, compared to net income of $1.89 billion, or $1.11 per diluted share, on revenue of $6.69 billion for the same period in the prior year. For 2015, Qualcomm reported net income of $5.27 billion, or $3.22 per diluted share, on revenue of $25.28 billion, compared to net income of $7.96 billion, or $4.65 per diluted share, on revenue $26.48 billion for 2014.

58.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

18

59.    On December 8, 2015, *Bloomberg* reported that the EU sent Qualcomm "two statements of objections listing concerns over sales and pricing tactics that may have thwarted competitors in the market for mobile-phone chip technology." According to the report, the EU issued its preliminary conclusions finding that the Company "illegally paid a customer for exclusively using Qualcomm chipsets and sold chipsets below cost" to force out a competitor out of the market. That same day, Taiwan's Fair Trade Commission launched an investigation into whether the Qualcomm's patent licensing arrangements violated the Taiwan Fair Trade Act.

60.    On this news, Qualcomm's share price fell $2.95, or 5.62%, to close at $49.98 on December 8, 2015.

61.    On January 27, 2016, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 27, 2015 (the "Q1 2016 10-Q"). For the quarter, Qualcomm reported net income of $1.49 billion, or $0.99 per diluted share, on revenue of $5.77 billion, compared to net income of $1.97 billion, or $1.17 per diluted share, on revenue of $7.09 billion for the same period in the prior year.

62.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

19

63.     On April 20, 2016, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 27, 2016 (the "Q2 2016 10-Q").  For the quarter, Qualcomm reported net income of $1.16 billion, or $0.78 per diluted share, on revenue of $5.55 billion, compared to net income of $1.05 billion, or $0.63 per diluted share, on revenue of $6.89 billion for the same period in the prior year.

64.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

65.     On July 20, 2016, Qualcomm filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 26, 2016 (the "Q3 2016 10-Q").  For the quarter, Qualcomm reported net income of $1.44 billion, or $0.97 per diluted share, on revenue of $6.04 billion, compared to net income of $1.18 billion, or $0.73 per diluted share, on revenue of $5.83 billion for the same period in the prior year.

66.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Mollenkopf and Davis, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

67.    On November 2, 2016, Qualcomm filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended September 25, 2016 (the "2016 10-K").    For the quarter, Qualcomm reported net income of $1.59 billion, or $1.07 per diluted share, on revenue of $6.18 billion, compared to net income of $1.06 billion, or $0.67 per diluted share, on revenue of $5.45 billion for the same period in the prior year.    For 2016, Qualcomm reported net income of $ 5.70, or $3.81 per diluted share, on revenue of $23.55 billion, compared to net income of $5.27 billion, or $3.22 per diluted share, on revenue $25.28 billion for 2015.

68.    The 2016 10-K contained signed certifications pursuant to SOX by Mollenkopf and Davis, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.    The statements referenced in ¶¶ 25-36, 38-44, 47-49, 51, 53, 55-58, and 61-68 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Qualcomm engaged in anticompetitive conduct to maintain a monopoly for semiconductors used in mobile phones in violation of federal

law; (ii) in turn, Qualcomm lacked effective internal controls over financial reporting; and (iii) as a result, Qualcomm's public statements were materially false and misleading at all relevant times.

70.     On December 28, 2016, the South Korean Fair Trade Commission fined Qualcomm a record $853 million for violating antitrust laws. After a three-year investigation, the Korean antitrust regulator found that Qualcomm breached antitrust law by limiting competing chip makers' access to its patents. It also found that the Company forced mobile-phone manufacturers into unfair license agreements by refusing to supply critical phone chips to those that disagreed to abide by its terms.

71.     On this news, Qualcomm's share price fell $1.50, or 2.23%, to close at $65.75 on December 28, 2017.

72.     On January 17, 2017, the FTC commenced an enforcement action against Qualcomm following an investigation of the Company's licensing practices.   The agency's complaint, filed in U.S. District Court for the Northern District of California, said that Qualcomm used its dominant position to maintain an illegal monopoly in the market.

73.     On this news, Qualcomm's share price fell $2.69, or 4.02%, to close at $64.19 on January 17, 2017.

74.     On January 20, 2017, The *Wall Street Journal* reported that tech-giant Apple Inc. was suing Qualcomm, alleging that the Company "leveraged its monopoly

22

position as a manufacturer of baseband chips, a critical component used in cellphones, to seek 'onerous, unreasonable and costly' terms for patents, and that Qualcomm blocked Apple's ability to choose another supplier for chipsets." The article further stated that Apple is seeking $1 billion in rebate payments that Qualcomm allegedly withheld as retribution for Apple's involvement in an investigation conducted by South Korea's antitrust regulator.

75. On this news, Qualcomm's share price fell $1.56, or 2.42%, to close at $62.88 on January 20, 2017.

76. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Qualcomm common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Qualcomm common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Qualcomm or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the

financial condition, business, operations, and management of Qualcomm;

- whether Defendants caused Qualcomm to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Qualcomm securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

83.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Qualcomm common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Qualcomm common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

84.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

85.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

26

87.    This Count is asserted against Qualcomm and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88.    During the Class Period, Qualcomm and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.    Qualcomm and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Qualcomm common shares during the Class Period.

90.    Qualcomm and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Qualcomm were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and

substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Qualcomm, their control over, and/or receipt and/or modification of Qualcomm allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Qualcomm, participated in the fraudulent scheme alleged herein.

91.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Qualcomm personnel to members of the investing public, including Plaintiff and the Class.

92.    As a result of the foregoing, the market price of Qualcomm common shares was artificially inflated during the Class Period.    In ignorance of the falsity of Qualcomm's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Qualcomm common shares during the Class Period in purchasing Qualcomm

28

common shares at prices that were artificially inflated as a result of Qualcomm's and the Individual Defendants' false and misleading statements.

93.    Had Plaintiff and the other members of the Class been aware that the market price of Qualcomm common shares had been artificially and falsely inflated by Qualcomm's and the Individual Defendants' misleading statements and by the material adverse information which Qualcomm's and the Individual Defendants did not disclose, they would not have purchased Qualcomm's common shares at the artificially inflated prices that they did, or at all.

94.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

95.    By reason of the foregoing, Qualcomm and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Qualcomm common shares during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

96.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

29

97.    During the Class Period, the Individual Defendants participated in the operation and management of Qualcomm, and conducted and participated, directly and indirectly, in the conduct of Qualcomm's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

98.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Qualcomm's financial condition and results of operations, and to correct promptly any public statements issued by Qualcomm which had become materially false or misleading.

99.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Qualcomm disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Qualcomm to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Qualcomm within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Qualcomm common shares.

30

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Qualcomm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 26, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)

31

468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Los Angeles, California 90067
Suite 1100
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
Email:  michael@goldberglawpc.com
brian@goldberglawpc.com

*Attorneys for Plaintiff*